IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 07-cv-01741-LTB-CBS

TESS PETERSON,

    Plaintiff,

v.

PRINCIPAL FINANCIAL GROUP, TARGET CORPORATION,
TARGET CORPORATION BENEFITS TRUST II,
and STATE STREET BANK AND TRUST,
TRUSTEE FOR THE TARGET CORPORATION BENEFITS TRUST II,

    Defendants.
_____

**ORDER**
_____

This disability benefits case is before me on the parties' cross-motions for summary judgment [**Docket ## 42, 45**], responses [**Docket ## 52, 53**], and replies [**Docket ## 58, 59**], and Defendants' sur-reply in opposition to Plaintiff's motion for summary judgment [**Docket # 62**]. Oral arguments would not materially assist the determination of these motions. After consideration of the motions, the papers, and the case file, and for the reasons stated below, I GRANT Defendants' Motion for Summary Judgment [**Docket # 42**] and DENY Plaintiff's Motion for Summary Judgment [**Docket # 45**].

**I. BACKGROUND**

The alleged relevant facts are as follows. Plaintiff is a former employee of Target Corporation ("Target"). This case concerns Plaintiff's claim for benefits under the Group Long-Term Disability Plan (the "Plan") established by Target to provide long-term disability coverage for Plan participants. The Plan is funded by contributions paid by its participants, and is self-

insured by Target. The Principal Life Insurance Company ("Principal")—apparently misidentified in this action as Principal Financial Group—administers claims, but is not liable for funding the Plan or paying benefits. On October 3, 2008, I dismissed this case with prejudice as to Defendants State Street Bank and Trust and Target Corporation Benefits Trust II [**Docket # 64**]. Accordingly, I refer to Target and Principal only when using the term "Defendants" in this Order.

On October 2, 2000, Plaintiff was involved in a car accident. Plaintiff underwent surgery to fuse vertebrae in her spine in March 2001 and November 2001. As a result of her ongoing injuries, Plaintiff stopped working for Target on October 30, 2001. In April 2002, Plaintiff asserted a claim for disability benefits under the Plan.

The Plan divides disability determinations into two time periods. In the first 24 months after a participant becomes eligible, the Plan will pay disability benefits if the claimant is incapable of performing more than eighty percent of her job responsibilities. After 24 months, the Plan will only pay disability benefits if the claimant can show she is unable to perform any job that provides 128% or more of the disability benefit ("extended disability").

Beginning March 30, 2002, Plaintiff received $1577.00 per month for 24 months. On March 26, 2004, Principal notified Plaintiff that she would no longer receive benefits beginning March 29, 2004, without further documentation of extended disability as defined by the Plan. Although Plaintiff submitted additional records, Principal notified Plaintiff on October 6, 2004, that her extended disability claim was denied. Plaintiff appealed her denial of benefits, and Principal notified her on October 28, 2005, that it would not reverse its original finding of non-disability under the Plan. It is not disputed that the decision to terminate Plaintiff's extended

disability benefits—and the first-level appeal of the decision to terminate Plaintiff's extended disability benefits—was made by Principal. Plaintiff again appealed, but was again denied on May 16, 2006. It is not disputed that the denial of the second-level final appeal of the decision to terminate Plaintiff's extended disability benefits was made by Target.

Plaintiff—by means of her First Amended Complaint filed October 23, 2007 [**Docket # 20**]—asserts a claim for relief under the Employee Retirement Income Security Act ("ERISA") Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Plaintiff asserts Defendants acted in an arbitrary and capricious manner when they determined Plaintiff was not qualified for extended disability benefits under the Plan beginning March 29, 2004.

## II. PLAINTIFF'S MEDICAL HISTORY

Plaintiff reports a history of medical problems beginning with her car accident on October 2, 2000. [Administrative Record ("AR") 412]. Plaintiff underwent surgery by Dr. Wieder to fuse vertebrae in her spine in March and November 2001. [AR 228]. In January 2002, Plaintiff reported to Dr. Wieder that she intended to return to work in March 2002. [AR 163]. Rather than return to work, however, Plaintiff asserted a claim for disability benefits in April 2002. [AR 443–46].

In June 2002, one of Plaintiff's treating physicians, Dr. Lair, limited Plaintiff to lifting no more than 30 pounds, no lifting of her arms above shoulder height, no pushing or pulling, no excessive bending, no sitting or standing for more than two hours at a time, and no repetitive movements with her arms. [AR 282]. Dr. Lair opined Plaintiff needed a new career or job, and recommended vocational training. [AR 282].

In November 2003, Plaintiff informed Principal of pain, neck spasms, and intense

headaches. [AR 113]. Plaintiff stated she intended to continue with her schooling, and then become a school counselor. [AR 114]. Plaintiff stated she attended classes two days a week for four hours at a time, attended a one hour study group twice per week, worked as an intern at an elementary school for eight and one-half hours per day three days per week, and did four hours of homework per night. [AR 114]. Plaintiff stated she tried not to overdo her activity level. [AR 114].

In December 2003, Plaintiff reported increased neck pain. [AR 1276–77]. In January 2004, Plaintiff underwent a functional capacity evaluation ("FCE") at HealthSouth Longmont. [AR 263–73]. The FCE report indicated Plaintiff was able to perform light or sedentary work full time. [AR 263]. Plaintiff indicated to the examiner that her neck and right arm were becoming tight and painful toward the end of the positional tolerance testing. [AR 264]. Plaintiff reported additional exacerbation of these symptoms to her physical therapist in January and February 2004. [AR 250–58]. Plaintiff's physical therapist noted Plaintiff's "progress has been reversed." [AR 251].

On February 27, 2004, Plaintiff met with Dr. Wieder for her pain. [AR 180–81]. Dr. Wieder noted Plaintiff's diagnosis and symptoms were "of relatively low severity." [AR 181]. An MRI showed mild disc bulging at C4–5 and C6–7, but otherwise normal alignment. [AR 182–86].

Following Principal's March 26, 2004, letter notifying Plaintiff that she would no longer receive benefits beginning March 29, 2004, without further documentation of extended disability as defined by the Plan, Principal received a brief note from Dr. Yurth in May 2004 stating: "At this point because of the degree of her pain, she has been unable to return to either school or

work." [AR 158]. Plaintiff reported pain to Dr. Yurth on a regular basis beginning in March 2004 and continuing through April 2005. [AR 674–80].

On June 16, 2004, Principal spoke with Plaintiff by telephone. Principal's file memo notes Plaintiff indicated she had not gone to the emergency room for pain since undergoing the FCE; she had a root block on May 2004, but it did not provide relief; she was taking Percocet for pain; she attended physical therapy twice per week and massage therapy once per week; she had pain radiating down her neck, back, and fingers; she was experiencing depression; she stopped taking classes in April 2004—after completing the classes she was enrolled in as of January 2004—because of her pain; her daily activities consisted of watching television and reading; she was still able to drive although it exacerbated her neck pain; she hired a nanny to help care for her infant son three days per week; and she did not know if she would have additional surgeries. [AR 615].

A July 6, 2004, MRI showed mild central canal stenosis at C4–5 with no evidence of nerve compression, and uncinate process hypertrophy at C5–6. [AR 682–83]. A March 25, 2005, MRI showed mild to moderate nerve encroachment at C4–5, C5–6, and C6–7. [AR 686].

Principal hired Facticon, Inc., to conduct video surveillance of Plaintiff over three days from August 21, 2004, through August 23, 2004. [AR 585–93]. The videotape showed Plaintiff driving, attending church, visiting coffee shops, grocery shopping, shopping at various other stores, carrying bags, and generally moving in a free and unrestricted manner with no evidence of pain. Plaintiff was observed pushing a cart in Home Depot and was able to bend over to pick an item up off the floor. Plaintiff was observed putting her child into his car seat, and was also able to remove him from the car seat and carry him. Plaintiff was able to carry her child with her

left arm while carrying two bags of groceries in her right hand.  Plaintiff was also able to carry her child in a front-mounted pack while carrying two large bags.

On November 1, 2004, Dr. Yurth wrote to Principal regarding Plaintiff's work restrictions.  [AR 672–73].  Dr. Yurth noted the surveillance video, and stated she encouraged Plaintiff to try and be as functional as possible.  Dr. Yurth placed Plaintiff on limited work restrictions on November 15, 2004, and again on January 5, 2005.  [AR 691–94, 709–10].  The January 5, 2005, assessment stated Plaintiff was able to lift ten pounds occasionally, could stand or walk for three or four hours in an eight hour day, could stand or walk for one hour without interruption, could sit for four hours and for 30 to 45 minutes without interruption, and was generally limited in other areas.  [AR 691–94].

### III. VOCATIONAL INFORMATION

Plaintiff has a Bachelor of Arts degree in psychology and has taken some classes toward a master's degree in school counseling.  On December 10, 2003, a psychology adviser at Iowa State University informed Principal that students with a Bachelor of Science degree in psychology are or may become qualified for a range of occupations, including positions in social services, hospitals, prisons, day care, police departments, public relations, law, and education.  [AR 595].  Although Principal did not inquire about a Bachelor of Arts degree in psychology, Principal then initiated an online job search of listings at Job Seeker, America's Career InfoNet, and Salary.com for available jobs that required a bachelor's or master's degree—either in Arts or Science—in psychology in Colorado.  [AR 596–606].  Principal concluded from these searches that there were a number of jobs available in Plaintiff's general area that required only a sedentary exertion level and that paid $24,222.72 per year or more.  [AR 580].

In connection with Plaintiff's initial appeal, Principal had a vocational specialist perform a transferable skills analysis, identify occupational alternatives for which Plaintiff was or could become qualified, and conduct a labor market survey for available jobs in Plaintiff's geographical area. [AR 622–44]. These reports also concluded jobs were available within Plaintiff's exertional and skills range and that paid $24,222.72 per year or more.

### IV. STANDARDS OF REVIEW

#### A. Summary Judgment

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is not proper if—viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor—a reasonable jury could return a verdict for the non-moving party. *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992).

In a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, *supra*, 477 U.S. at 323 (quoting FED. R. CIV. P. 56(c)). If this burden is met, then the non-moving party has the burden of showing there are genuine issues of material fact to be determined. *See id.* at 322. It is not enough that the evidence be merely colorable; the non-moving party must come forward with specific facts showing a genuine issue for trial. *See*

*id.*; *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). I shall grant summary judgment, therefore, only if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lucas v. Mountain States Tel. & Tel.*, 909 F.2d 419, 420 (10th Cir. 1990); FED. R. CIV. P. 56(c).

In a motion for summary judgment, I view the evidence "through the prism of the substantive evidentiary burden." *Liberty Lobby*, *supra*, 477 U.S. at 254. The inquiry is based on "the quality and quantity of evidence required by the governing law" and "the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant." *Id*. Accordingly, in this ERISA case, Plaintiff must show material facts in dispute by a preponderance of the evidence in order to defeat Defendants' motion for summary judgment. Plaintiff meets this burden if she sets forth evidence that—if believed by the ultimate factfinder—makes the question of Defendants' wrongdoing more likely than not. The same burden applies to Defendants in regard to Plaintiff's motion.

### B.  ERISA Review

Where—as here—an ERISA benefits plan grants an administrator discretion in determining benefits eligibility, the decision of the administrator should generally be upheld unless the decision is found to be arbitrary or capricious. *See Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1002–03 (10th Cir. 2004). Under the arbitrary and capricious standard, I must uphold the plan administrator's decision if it is grounded on any reasonable basis, and that

basis need not be the only logical one or even the best one. *See Kimber v. Thiokol*, 196 F.3d 1092, 1098 (10th Cir. 1999).

When there exists a conflict of interest or procedural irregularity in the decision-making process, however, less deference may be warranted. *See Fought*, *supra*, 379 F.3d at 1003, 1007. If a plaintiff can prove a serious conflict of interest or the existence of a serious procedural irregularity, then the burden shifts to the plan administrator to prove the reasonableness of its decision under the arbitrary and capricious standard. *See Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007). To the extent the conflict of interest or procedural irregularity is not "serious," the Court may nonetheless shift the degree of deference along a sliding scale in accordance with the degree of the conflict or irregularity. *See Fought*, 379 F.3d at 1003–04, 1006. After reviewing the papers and the exhibits, I find and conclude Plaintiff fails to show the sliding scale should be applied in this case.

*1. Conflict of interest*

The burden of showing a conflict of interest is on the plaintiff. *See Fought*, *supra*, 379 F.3d at 1005. Because an administrator may favor its interest above the interests of the plan beneficiaries, when an administrator incurs expense as a result of benefits determinations that are favorable to plan participants, the degree of deference may vary on a sliding scale in accordance with the degree of the conflict. *See id..* at 1003–04. Before applying the sliding scale, however, it is first necessary for the plaintiff to provide proof that the plan administrator's role as an intermediary between the employer and the plan participants jeopardized the administrator's impartiality. *See Kimber*, *supra*, 196 F.3d at 1097. Various factors to consider in making this inquiry include "whether: (1) the plan is self-funded; (2) the company funding the plan appointed

and compensated the plan administrator; (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan." *Id*. at 1098.

It is not disputed that the Plan is self-funded and Target appointed and compensated Principal as the plan administrator. It is also undisputed, however, that there were no financial bonuses, incentives, stock options, honors, awards or other compensation—nor any plans, policies or procedures addressing the same—that were related in any way to the approval or denial of Plaintiff's extended disability claim. Likewise, Plaintiff presents no evidence showing that the approval or denial of extended disability benefits had any impact on Principal as the company administering the plan. Principal appears to have been acting as a neutral administrator, and Plaintiff points me to no evidence to the contrary. Accordingly, there appears to be no conflict of interest.

Plaintiff argues the Supreme Court's recent ruling in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), teaches a different conclusion. A review of the facts in *Glenn* shows Plaintiff's reliance is misplaced. In *Glenn*—unlike the case at bar—the administrator of the plan was also the ultimate payor of benefits. *Glenn*, 128 S. Ct. at 2346. Target's plan, however—as previously held in my Order in this case on September 20, 2007 [**Docket # 16**]—is "paid for entirely by the collection of premiums from Target's employees . . . without any employer contributions." Any funds not paid due to the denial of a claim do not enrich the administrator or the employer, but rather remain in the trust funded by Target employees. While Target would ultimately be responsible for ensuring benefits payments in the event of a shortfall in the trust, such a connection is too tenuous to raise the possibility of conflict above the

speculative level. Accordingly, as the burden of showing conflict remains on Plaintiff, I find no conflict under the facts presented here sufficient to justify a level of review other than the "arbitrary and capricious" standard.

## 2. *Serious procedural irregularities*

A serious procedural irregularity is not present every time a plan administrator comes to a decision adverse to the claimant on conflicting evidence. *See Grosvenor v. Qwest Commc'ns Int'l*, 191 F. App'x 658, 662 (10th Cir. 2006). In order for the irregularity to be "serious"—such that the burden shifts to the plan administrator to prove the reasonableness of its decision under the arbitrary and capricious standard—the claimant must also show the irregularity raises significant doubts whether the result reached was the product of an arbitrary decision or the plan administrator's whim. *See McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000). "For example, where the plan trustee does not inquire into the relevant circumstances at issue; where the trustee never offers a written decision, so that the applicant and the court cannot properly review the basis for the decision; or where procedural irregularities are so egregious that the court has a total lack of faith in the integrity of the decision making process, a court may infer that the trustee did not exercise judgment when rendering the decision." *Id*.

Plaintiff points to three areas where she perceives serious procedural irregularities: (1) Principal failed to accord appropriate weight to Plaintiff's treating physician Dr. Yurth when determining Plaintiff was not disabled after March 29, 2004; (2) Principal did not undertake an adequate vocational analysis when determining there were jobs Plaintiff could perform that would pay 128% or more of her disability benefit; and (3) Principal and Target did not produce medical and vocational reports relied upon in denying Plaintiff's initial and final appeals until

after the appeals were denied. As to the first two contentions, these go to the correctness and validity of Defendants' ultimate decisions and are not properly considered under a "procedural irregularities" inquiry. Turning to Defendants' failure to disclose the medical and vocational reports they relied upon in denying Plaintiff's initial and final appeals until after the appeals were denied, the parties agree that *Metzger v. UNUM Life Insurance Co. of America*, 476 F.3d 1161 (10th Cir. 2007), provides the appropriate framework for my analysis.

ERISA regulations require that every employee benefits plan include a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefits determination, and that includes a full and fair review of the claim and the adverse decision. *See* 29 C.F.R. § 2560.501-1(h)(1). The appeals process will not be deemed to offer a claimant a reasonable opportunity for appeal unless the procedure requires "that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." *See* 29 C.F.R. § 2560.501-1(h)(2)(iii).

ERISA does not, however, "require a plan administrator to provide a claimant with access to the medical opinion reports of appeal-level reviewers prior to making a final decision on appeal." *Metzger*, *supra*, 476 F.3d at 1167. As held in *Metzger*, ERISA regulations mandate provision of relevant documents, including medical opinion reports, only at two discrete stages of the administrative process:

> First, relevant documents generated or relied upon during the initial claims determination must be disclosed prior to or at the outset of an administrative appeal. Second, relevant documents generated during the administrative appeal—along with the claimant's file from the initial determination—must be disclosed after a final decision on appeal. So long as appeal-level reports analyze evidence already known to the claimant and contain no new factual information

or novel diagnoses, this two-phase disclosure is consistent with "full and fair review."

*Metzger*, 476 F.3d at 1167.

Plaintiff argues Principal relied on a new medical opinion and a new transferable skills analysis and labor market survey when denying her first-level appeal, and Target relied on an additional medical opinion when denying her second-level final appeal, but none of these reports were disclosed until after the respective appeals. While conceding the general rule that such reports do not need to be disclosed until after the decision on appeal, Plaintiff nonetheless argues that *Metzger* requires these specific reports be disclosed because they each contained "new factual information." *See Metzger*, *supra*, 476 F.3d at 1167. Even if this broad rule were the proper reading of *Metzger*—which, as the Tenth Circuit subsequently clarified, it is not, *see Forrester v. Metro. Life Ins. Co.*, 232 F. App'x 758, 760 (10th Cir. 2007) ("*Metzger* indicated that ERISA review obligations *could require disclosure* of consultant reports if they 'analyze evidence not already known to the claimant' and thus interject 'new factual information or novel diagnoses' into the case at the administrative-appeal level") (quoting *Metzger*, 476 F.3d at 1167) (emphasis added)—I disagree with Plaintiff's contention that the reports in question contained "new factual information" not "already known to the claimant."

As *Metzger* makes clear, medical opinions generated—as here—by review of an employee's existing records do not contain "new factual information" and therefore need not be disclosed to the employee during the course of her administrative appeal. *See Metzger*, *supra*, 476 F.3d at 1163–64, 1167–68. Similarly, the transferable skills analysis and labor market survey do not contain "new factual information." These reports—which are provided in the administrative record on pages 622 through 644—reviewed Plaintiff's existing record and

-13-

compared Plaintiff's abilities and skills to those necessary to perform available jobs in the local economy. The rehabilitation counselor who wrote the reports based his opinions on findings from the Bureau of Labor Statistics, the Dictionary of Occupational Titles, and other public sources including online job listings. Information from these publicly available sources cannot properly be cast as "new factual information." Likewise, even if the information was not "already known to the claimant," the lack of knowledge can only be attributable to Plaintiff's own oversight as the information was readily available to Plaintiff and her counsel.

*Metzger* expressed concern that allowing a claimant to rebut each report generated during an administrative appeal would unduly prolong the appeal process. *See Metzger*, *supra*, 476 F.3d at 1166. *Metzger* therefore limited the scope of rebuttable reports to those that contain information that can properly be rebutted—that is, reports that contain information that could not reasonably have been anticipated by the claimant when filing her own reports in support of her appeal. *See id*. at 1166–67. Plaintiff had an opportunity to—and, in fact, did—submit her own transferable skills analysis and labor market survey. *See* AR 521–35. This is all the ERISA regulations require. *See* 29 C.F.R. §§ 2560.503-1(g) & (h); *see also Metzger*, 476 F.3d at 1167 n.4. Accordingly, I find no evidence of conflict of interest or procedural irregularities sufficient to apply the sliding scale and consider this case under the arbitrary and capricious standard of review. *See Fought*, *supra*, 379 F.3d at 1002–03.

## V. INITIAL DENIAL OF PLAINTIFF'S CLAIM

Under the "arbitrary and capricious" standard of review, the question for this Court is whether—in light of the administrative record as a whole—the Plan administrator's benefits determination was reasonable. *See Fought*, *supra*, 379 F.3d at 1003. In order for the decision to

be reasonable, it must be based upon substantial evidence. *See Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (holding the court should ask whether the determination of disability "was arbitrary and capricious because it was unsupported by substantial evidence"). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987). The administrator's decision need not be the only logical one, nor even the best one; it need only fall somewhere along the continuum of reasonableness—even if on the low end. *See Kimber*, *supra*, 196 F.3d at 1098. A review of the administrative record shows Plaintiff fails to demonstrate a material question of fact exists whether the decision to deny Plaintiff's extended disability claim was not reasonable under this standard.

Under the terms of the Plan, the administrator was required to deny Plaintiff's extended disability claim after 24 months unless Plaintiff showed she was unable to earn 128% of her disability benefit. Plaintiff was therefore required to show her disability prevented her "from performing any work or occupation for which [she was], or [could] become, reasonably fitted by education, training, or experience" that paid $24,222.72 per year or more. [AR 15].

Principal denied Plaintiff's extended disability claim on October 6, 2004. [AR 572–82]. The denial letter reviewed Plaintiff's medical records, the results of the FCE performed on January 8, 2004, information regarding Plaintiff's schooling and participation in an internship during her disability period, and a surveillance video of Plaintiff recorded between August 21, 2004, and August 24, 2004. In determining Plaintiff was not entitled to extended disability, Principal made two factual findings. First, Principal found that a review of the evidence showed

Plaintiff was able to work at least at a "sedentary" level.  Second, Principal found that jobs for which Plaintiff was qualified—or could become qualified through education, training, or experience—were available in the Longmont and Boulder area that fell into the "sedentary" job category and paid more than $24,222.72 per year.  Plaintiff provides me with no evidence showing—even when construed in the light most favorable to her—that these findings were arbitrary and capricious.

      A.  Substantial Evidence Showed Plaintiff Was Able to Work at a Sedentary Level

In determining in October 2004 that Plaintiff was able to work at the "sedentary" level, Principal relied on substantial evidence in Plaintiff's medical record.  Principal noted: (1) in June 2002, Dr. Lair believed Plaintiff would be able to work in another field with additional training [AR 282]; (2) as of November 2003, Plaintiff was able to perform activities related to her education—including attending class and working as an intern—for over fifty hours per week [AR 114]; (3) in January 2004, Plaintiff's FCE indicated she was able to perform "light" or "sedentary" work full-time [AR 263]; (4) although Plaintiff complained that the FCE exacerbated her pain, she continued to attend classes and her internship through April 2004 [AR 615]; (5) in February 2004, Dr. Wieder found Plaintiff's symptoms and diagnosis to be of relatively low severity [AR 181]; (6) Plaintiff did not visit the emergency room for her pain and was able to manage her pain with Percocet [AR 615]; (7) Dr. Yurth noted in May 2004 that Plaintiff was "definitely doing better overall" [AR 676]; (8) Dr. Wieder opined in July 2004 that Plaintiff's cervical range of motion was normal [AR 578]; and (9) the surveillance video taken in August 2004 showed Plaintiff was more active than she had reported to Principal and that Plaintiff was able to carry her child around, and turn, squat, and bend while placing him into and

removing him from his car seat [AR 579].

Although Plaintiff argues Principal ignored evidence—in particular, evidence that the FCE exacerbated Plaintiff's condition to the point that she was forced to quit school—showing she was unable to do any job, a review of Principal's decision shows this is not the case. Initially, I note that much of the "medical evidence" upon which Plaintiff relies amounts to nothing more than her own subjective complaints. Although relevant, subjective complaints do not form the sort of "reliable evidence, including the opinions of a treating physician" which must be considered by a plan administrator. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Further, to the extent Plaintiff's subjective complaints were verified by objective testing or were supported by Plaintiff's treating physicians, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician" in an ERISA case. *Id*.

The relevant inquiry is not whether Principal's conclusion was the best one, but rather whether Principal's conclusion was a reasonable one—even if on the low end of reasonableness. *See Kimber*, *supra*, 196 F.3d at 1098. After considering Plaintiff's voluminous medical history, Principal found that the evidence—including medical reports from Plaintiff's treating physicians and the video surveillance—addressing Plaintiff's level of functioning *after* the FCE was consistent with the ability to perform sedentary work. Accordingly, Principal's October 6, 2004, conclusion that Plaintiff was able to perform sedentary work was based on substantial evidence and was therefore reasonable.

### B. Substantial Evidence Showed Jobs were Available to Plaintiff that Paid Over 128% of Plaintiff's Disability Benefit

Once Principal determined Plaintiff was able to perform sedentary work, Plaintiff was required to show there was no sedentary "work or occupation for which [she was], or [could] become, reasonably fitted by education, training, or experience" that paid $24,222.72 per year or more. [AR 15]. Principal identified at least four jobs for which she was—or could become with education, training, or experience—qualified: (1) professional research assistant, Kempe Children's Center; (2) mental health counselor, Poudre Valley Health; (3) clinical case manager, Mental Health Corporation of Denver; and (4) medical social worker, McKee Medical Center. [AR 596–99]. The median income of these jobs in Colorado ranged between $28,300.00 and $47,700.00 per year. [AR 600-607]. Although Plaintiff argues she lacked the education or experience for these jobs, the plain language of the Plan requires only that jobs be available for which Plaintiff could *become* qualified "by education, training, or experience." [AR 15]. Accordingly, under the terms of the Plan, Principal's determination that Plaintiff was not entitled to extended disability benefits was based on substantial evidence and is therefore reasonable.

## VI. PLAINTIFF'S APPEALS

In support of her first-level appeal, Plaintiff submitted additional medical records. These records were reviewed by Dr. Plunkett, an orthopedic surgeon. [AR 646–57]. Dr. Plunkett also spoke directly with Dr. Yurth regarding Dr. Yurth's impression of Plaintiff's ability to perform sedentary or light duty work. [AR 653–54]. Dr. Yurth informed Dr. Plunkett "that there is nothing objective that precludes [Plaintiff] from working nor is there anything that [Dr. Yurth] could see that would prevent [Plaintiff] from working other than the fact that she is taking extensive pain medications and the pain medications and the need for frequent position changes tends to exacerbate her pain complaints." [AR 654].

Plaintiff argues Dr. Plunkett miscast the content of his conversation with Dr. Yurth. Again, Plaintiff mostly provides records of her own frequent complaints of pain and requests for increasingly potent narcotics. The only evidence showing anything "objective that precludes Plaintiff from working" is an office note of April 4, 2005, reviewing a recent MRI and showing Plaintiff had "some progressive changes" from a previous MRI scan. [AR 679]. Although Dr. Yurth noted "at C5–6 [Plaintiff] does have the fusion and at C6–7 there is significant facet hypertrophy, spurring and a left posterolateral protrusion causing some mild to moderate left neural foraminal stenosis," Dr. Yurth only recommended additional pain treatment. This is fully consistent with Dr. Plunkett's report. Accordingly, Plaintiff provides no evidence supporting her argument sufficient to raise a genuine question of material fact.

Plaintiff also argues that the transferable skills analysis and labor market survey performed in connection with her initial appeal is unsupportable because the findings were based upon an assumption that Plaintiff was able to perform sedentary work. As I previously held this assumption was reasonable and based upon substantial evidence, Plaintiff's argument on this point also fails to raise a genuine question of material fact. Likewise, Plaintiff's argument regarding her lack of education or experience for the jobs considered in connection with her appeal are based on Plaintiff's misreading of the terms of the Plan and fail to show a material question of fact exists whether Principal's determination on appeal that Plaintiff was not entitled to extended disability benefits under the Plan was not reasonable or based on substantial evidence.

Plaintiff's final appeal was conducted by Target and was denied on March 27, 2006. [AR 1092–98]. No additional records were submitted in connection with the final review.

Accordingly—and for the same reasons noted above in regards to the initial review—Plaintiff fails to show a material question of fact exists whether Target's determination on appeal that Plaintiff was not entitled to extended disability benefits under the Plan was not reasonable or based on substantial evidence.

## VII.  CONCLUSION

A review of the evidence and arguments presented by both parties shows there is no genuine dispute that Defendants reasonably denied—and upheld denial of—Plaintiff's extended disability benefits request, and based its decision on substantial evidence.  Thus, there are no genuine issues of material fact that preclude summary judgment in Defendants' favor on Plaintiff's ERISA claim.  *See Smith v. Metropolitan Life Ins. Co.*, 344 F. Supp. 2d 696, 704 (D. Colo. 2004).  Accordingly, Defendants' Motion for Summary Judgment [**Docket # 42**] is GRANTED; Plaintiff's Motion for Summary Judgment [**Docket # 45**] is DENIED.


Dated: October   17  , 2008.

                                                        BY THE COURT:

                                                             s/Lewis T. Babcock
                                                        Lewis T. Babcock, Judge